Joe Balestrieri & Co. v. Commissioner.
Joe Balestrieri & Co. v. Commissioner
Docket No. 12834.
United States Tax Court
1948 Tax Ct. Memo LEXIS 124; 7 T.C.M. (CCH) 553; T.C.M. (RIA) 48145; August 2, 1948
Louis Janin, Esq., for the petitioner. C. W. Nyquist, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined a deficiency in petitioner's excess profits tax liability for the year 1943 in the sum of $25,021.71. The only error alleged in the amended petition is as follows: "The Commissioner erred in disallowing the loss of $22,229.37, or any part thereof, resulting from a business venture between petitioner and Strategic Mineral Exploration Co., a partnership." Respondent had disallowed this alleged loss as not being "an allowable deduction under section 23 of the Internal Revenue Code." Findings of Fact Petitioner is a corporation organized in 1941 under the laws of the State of California. Its business is that of a wholesale dealer in fish. Its corporation *125 income and declared value excess profits tax and corporation excess profits tax returns for the year 1943 were filed, on a cash basis, with the collector of internal revenue for the first district of California. Petitioner's capital stock was entirely owned by Joe Balestrieri and W. E. Otto, or by members of their immediate family. Balestrieri was president of petitioner and Otto was vice-president. Both were members of petitioner's Board of Directors. In the early summer of 1943, one J. M. Hoff, a mining engineer, approached Otto, in his individual capacity, with a proposition for the mining and milling of chrome ore. Thereafter, Otto introduced Hoff to Balestrieri. In July 1943, after several conversations and after each had convinced himself that very large profits would be derived from the mining and milling of this ore, the three individuals named (Hoff as party of the first part, Balestrieri as party of the second part, and Otto as party of the third part) executed Articles of Co-partnership, which are incorporated herein by reference, and which provide, in substance, as follows: Each party would have an equal interest in the partnership, which would operate under the name *126 of Strategic Mineral Exploration Co. and should engage "in the business of prospecting for, buying and selling mines and interests in mines, metals, strategic materials of all kinds and characters, and mining machinery and equipment, and to perform services in the nature of mining engineering." Hoff was to devote his full time and attention to the carrying on of the business of the partnership. Balestrieri and Otto were to provide an office and provide Hoff with traveling expenses and money with which to maintain himself for a period of six months. The profits were to be shared equally between the partners, after reimbursing Balestrieri and Otto for any sums advanced. Shortly thereafter, a "Certificate of Co-Partners Transacting Business Under Fictitious Name" was filed with the county clerk in San Francisco, certifying that the three above-named individuals were "all the members of said co-partnership." In order to secure finances for the partnership, Otto, on behalf of the partnership, approached the Pacific Vegetable Oil Corporation, with which concern the petitioner and Balestrieri and Otto had had previous business dealings. After a conversation with one of the officers of that *127 corporation, Otto, on behalf of the partnership wrote to the Pacific Vegetable Oil Corporation the following letter: "July 23, 1943 "Pacific Vegetable Oil Corp.
"62 Townsend Street "San Francisco, California
"Attention: Mr. B. T. Rocca "Dear Mr. Rocca: "SUBJECT: FINANCING CHROME ORE THROUGH PLANT OF THE MONTROSE MINE & MILLING COMPANY - CASTELLA "This is to confirm conversation wherein you agreed to finance the purchase of Chrome ore and milling and the discounting of the invoices upon the following basis: Funds are to be provided for the purchase of ore, about as follows: 1. Chrome ore - Expected Av. price - $12.00 per ton 2240# 2. Milling ore - $2.50 per ton 2240# 3. Freight on Concentrates to Sacramento - $4.00 per ton 2240# From the above, and based on 100 tons a day, a 10 day run will require approximately $15,000.00; if 200 tons, and this is expected within 60 days, it will require $30,000.00. A Partnership, Strategic Minerals Exploration Co., consisting of J. M. Hoff, W. E. Otto and J. Balestrieri, will buy this ore. It will be milled in the mill of the Montrose Mine and Milling Company. "The concentrated chrome will then be shipped to the Metals *128 Reserve stock pile at Sacramento on a straight bill of lading which will be consigned to us. The railroad company will furnish weight tag; Abbot Hanks will sample car at Sacramento and furnish us with assay certificate; Montrose Mine & Milling Co. will prepare invoices and assign invoices to Strategic Minerals Exploration Co., who in turn will assign invoices to you. When the invoices have been assigned to you, procedure is as follows. We first figure out what you have advanced against the car, namely: COST OF ORE Milling Freight on concentrate "The above costs are added and the difference between the above costs and the invoice value you then advance 80% to the Montrose Mine & Milling Co. This we do until the sum of $80,000.00 has been paid. The remaining 20%, 1/4 goes to you for financing; 1/4 to Strategic Minerals Exploration Co. and 1/2 held by you to liquidate Otto Sales Company accounts. When Otto Sales Co. account has been paid [paid] in full, then this 1/2 share will be paid to Strategic Minerals Exploration Company. When the sum of $80,000.00 has been paid to Montrose Mine & Milling Company, Strategic Minerals Exploration Co. will then participate in all earnings on *129 a 50-50 basis. As long as you are financing the deal, you will receive 25% of our net earnings - never any part of the mill owners' share of earnings. When it is no longer necessary for you to finance the milling operations, you will participate to the extent of 10% of our share of the earnings for the duration - our share being either 20% or 50%. "We will be very pleased to issue you notes for all sums of money advanced for ore or against invoices. "The write has made an extensive investigation of the mill operation, seen the plant running; and under extremely competent mill operating engineers it is turning out a very fine product on a profitable basis. "The writer has also personally investigated the financial setup of the Montrose Mine & Milling Company and it is in perfect shape. Our setup is such that as soon as we buy the ore and own it and pay the mill for milling it there is no possible prospect or hazard of any unknown thrid [third] party entering the scene and causing any trouble. Considerable time, thought and study was given this feature and the entire operation set up to eliminate any possible unknown trouble or complication. "The writer at the start of the *130 deal will go to Dunsmuir and personally see to it that the mine producers of ore are paid, and an account will be kept in the local bank of Dunsmuir in the name of S.M.E. Co. and check will only be issued when either signed by W. E. Otto or B. T. Rocca. "We are very appreciative of your agreeing to handle the financing of the above transaction. "Yours very truly, "OTTO SALES COMPANY "s/W. E. Otto "WEO: MW "P.S. I neglected to insert above, that should our operations be so unfortunate as to result in a loss, no part of this loss will be for your account, but will be taken care of in its entirety by J. M. Hoff, Joe Balestrieri and W. E. Otto." The Pacific Vegetable Oil Corporation indicated that it would agree to the proposition outlined by Otto provided petitioner's Board of Directors would agree to "underwrite" any loss which the Pacific Vegetable Oil Corporation might sustain as a result of its discounting any invoices of the partnership. Thereupon, Otto, on behalf of the partnership, wrote to petitioner the following letter: "STRATEGIC MINERAL EXPLORATION CO. "Mines and Mining "255 California Street "Garfield 6236 "San Francisco 11, Calif.
"July 24, 1943 *131 "Joe Balestrieri & Co. "432 Clay Street "San Francisco, California
"Gentlemen: "Offer to participate in profits of Chrome Milling Operation to be handled by this partnership in consideration of guaranteeing venture. "With reference to letter written by Otto Sales Company to the Pacific Vegetable Oil Corp. dated July 23, 1943, which was written in behalf of Strategic Mineral Exploration Company, we hereby offer you a one-half participation in any profits that the Strategic Mineral Exploration Company may earn. All as outlined in letter attached hereto. The consideration for this offer is that your corporation agrees to guarantee the payment of any losses or deficits that may occur on the money borrowed from the Pacific Vegetable Oil Corporation on our chrome milling venture. "In the event that you decide to participate in this venture, please have your Board of Directors ratify same and formally confirm same to us in writing. "Yours very truly "STRATEGIC MINERAL EXPLORATION CO. "S/n W. E. Otto" WEO;b On July 26, 1943, the directors of petitioner, consisting of Balestrieri and Otto, held a meeting, the minutes of which are as follows: "CONSENT TO A SPECIAL MEETING *132 OF THE BOARD OF DIRECTORS OF JOE BALESTRIERI & CO., A CORPORATION "The Directors of JOE BALESTRIERI & CO., a corporation, do hereby consent to the holding of a special meeting of the said Board of Directors at the office of said corporation, No. 432 Clay Street, San Francisco, California, at the hour of 2:00 P.M. on July 26, 1943. PRESENT: Joe Balestrieri, President W. E. Otto, Vice-President "1. Minutes of previous meeting, dated February 24, 1943 read and approved. "2. The letter addressed to the corporation by the Strategic Minderal [Mineral] Exploration Company was submitted and the proposal to participate in one-fourth of the earnings of the Chrome Milling venture at Castella was accepted. The corporation in turn guaranteed any losses or deficits that may occur on money borrowed from the Pacific Vegetable Oil Corporation on the crome [chrome] milling venture. "3. It was ordered and directed that the president accept the offer. "4. Upon motion duly made by W. E. Otto and seconded by J. Balestrieri, it was unanimously voted and approved to accept and confirm all the above. "5. There being no further business, the meeting was adjourned. "RESPECTFULLY [RESPECTFULLY] *133 SUBMITTED TO THE BOARD OF DIRECTORS OF THE JOE BALESTRIERI CO. "BY SECRETARY "APPROVED: "PRESIDENT "S/n W. E. Otto" A mistake was made in these minutes (prepared by a daughter of Balestrieri) in that the minutes referred to "one-fourth of the earnings of the Chrome Milling venture" instead of "one-half." On the same date petitioner wrote the following letter to the partnership: "July 26, 1943 "Strategic Mineral Exploration Co. "255 California Street "San Francisco, California
"Gentlemen: "This is to acknowledge receipt of your offer of July 24 for our participation in your Chrome Milling venture at Castella, California, all in accordance of letter written to Pacific Vegetable Oil Corporation as of your letter of July 23rd, 1943. Please be advised that we herewith accept this proposal of yours to participate in the profits of your chrome milling operation and we in turn guarantee any losses should they occur. The Board of Directors this day have had a meeting and all the above has been confirmed by them. "Yours very truly "JOE BALESTRIERI & COMPANY "Joe Balestrieri "President" JB:b Petitioner's Board of Directors having taken this action, the Pacific *134 Vegetable Oil Corporation consented to and did discount invoices of the partnership in accordance with its proposal outlined in the letter of July 23, 1943. Before the end of 1943, the partnership had lost approximately $39,000. The partners decided to cease operations and to liquidate the partnership business. Considerable bitterness developed between Balestrieri and Otto on one hand and Hoff on the other. Hoff refused to assume any responsibility for the losses of the partnership and "walked out on" Balestrieri and Otto. There was due to the Pacific Vegetable Oil Corporation, on account of its financial dealings with the partnership, the sum of $22,229.37. In 1943, petitioner executed its note in that amount to the Pacific Vegetable Oil Corporation, but payments thereon were not made by petitioner until the following year. The other unpaid bills of the partnership, in the approximate sum of $17,000, were paid gradually by Balestrieri and Otto. Opinion KERN, Judge: The question in this proceeding is whether the effect of the transactions detailed in our findings was to make the petitioner a guarantor of the liabilities of the partnership to the Pacific Vegetable Oil Corporation *135 with the secondary liability incident to a guarantee, or, as petitioner contends, made it in effect a participant in a joint venture with the primary liability of one of the venturers. If the petitioner is held to be a guarantor then our decision must be for respondent since petitioner has failed to prove any payment in the taxable year of the obligation guaranteed which would give rise to any indebtedness to it on the part of the members of the partnership who were primarily liable on the obligation to the Pacific Vegetable Oil Corporation, and, even if such an indebtedness had been created, there is no proof that it was worthless in the taxable year. Petitioner contends that the language used by laymen acting without advice of counsel in the negotiations and instruments incident to the transactions in question was ambiguous, that the testimony of Balestrieri and Otto indicated the intent of the parties to have been that petitioner was to bear all losses, if any, of a joint venture of which it was to be a party, that the large share of the profits of the venture to which petitioner, by virtue of the agreement, was entitled is more consistent with a joint venture than to a guarantee, *136 and that the word "guarantee" though used in the several documents above referred to may describe either a primary or secondary obligation. We are unable to reach the conclusion to which petitioner's argument would lead us. The salient facts emerging from the record are these: Petitioner was a small but prosperous corporation controlled by its two stockholders, Balestrieri and Otto, and engaged in the wholesale fish business. These two individuals were convinced by one Hoff, a mining engineer, that a fortune could be made in a chrome mining and milling venture. After some investigation and a preliminary survey, Balestrieri, Otto and Hoff formed a partnership to engage in this venture. The partnership agreement contemplated that Hoff would contribute his services and that Balestrieri and Otto would defray the expenses and the profits, anticipated to be a huge amount, would be divided equally among the three. Funds in a considerable amount became necessary for the purchase of chrome and the expense of milling it. Otto, on behalf of the partnership, approached the Pacific Vegetable Oil Corporation in an effort to obtain a large part of such funds from this corporation. The corporation *137 would not furnish such funds on the unsecured obligation of the individual partners, but indicated that it would furnish funds if repayment was "underwritten" by petitioner. Thereupon Otto, on behalf of the partnership, wrote to petitioner corporation (all of the stock of which was owned by him and Balestrieri) offering to petitioner "a one-half participation in any profits that [the partnership] may earn" in return for an agreement by petitioner "to guarantee the payment of any losses or deficits that may occur on the money borrowed from the Pacific Vegetable Oil Company on our chrome milling venture." Petitioner's Board of Directors adopted a resolution accepting this offer. Thereafter, the Pacific Vegetable Oil Corporation furnished funds to the partnership. The record does not contain any instrument setting forth the terms of the obligation created thereby. It may be supposed that if any existed it was signed by the three partners. It may also be supposed that the only evidence of petitioner's liability in the transaction is contained in Otto's letter to it, the resolution of its directors, and its letter to the partnership. At that time neither petitioner nor the partnership *138 considered any loss likely in connection with the transactions with the Pacific Vegetable Oil Corporation, or otherwise. When the partnership's business proved unprofitable and was discontinued, Hoff disappeared from the scene in an atmosphere of mutual recriminations, petitioner gave its note to the Pacific Vegetable Oil Corporation in the approximate amount of $22,000, then due to that corporation, which was paid by petitioner after the taxable year, and Balestrieri and Otto paid the other accounts due from the partnership in the approximate amount of $17,000. These facts persuade us that petitioner's role in the transaction was that of a guarantor of a specific account. Petitioner places considerable reliance upon the testimony of Balestrieri and Otto, which was rather general in character, to the effect that the parties intended that petitioner should participate as a principal in a joint venture in consideration for its agreement to underwrite and absorb all losses which might be sustained by the venture. Both of these witnesses impressed us as being respectable men, but the force of their testimony is weakened by the following considerations: (1) It was given some five years *139 after the event, (2) it was highly self-serving, and (3) it is inconsistent with the known facts, in that petitioner paid not all of the losses or debts of the venture but only the account of the partnership which it specifically guaranteed. Petitioner also relies in his argument upon the fact that the consideration moving to petitioner for its assumption of liability in the transaction was unduly generous if the liability assumed was only that of a guarantor, but was not unduly large if it assumed general primary liability for all of the debts of a joint venture in which it was a participant. The force of this argument, however, is weakened by reason of the fact that Balestrieri and Otto owned all of petitioner's stock and, so far as the record discloses, conducted all of the financial negotiations on behalf of the partnership. Since each of them would receive half of petitioner's profits while receiving only one-third of the profits of the partnership, it was to their interests to divert as much as possible of the large anticipated profits of the partnership to the petitioner corporation regardless of the quid pro quo obtained from petitioner; and we are, therefore, unwilling to *140 look upon the transaction as wholly at arm's length so far as petitioner and those acting for the partnership are concerned. Since we have decided that petitioner's liability was the secondary liability of a guarantor of a specific account, Decision will be entered for respondent.